## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| CHRISTINA RICCI, | Case No.: 1:19-cv-00110-REB |
| Petitioner, | |
| vs. | **MEMORANDUM DECISION AND ORDER** |
| ANDREW SAUL, Commissioner of Social Security, | |
| Respondent. | |

Pending is Christina Ricci's Petition for Review[1] (Dkt. 1), appealing the Social Security Administration's final decision finding her not disabled and denying her claim for disability insurance benefits. *See* Pet. for Review (Dkt. 1). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order.

## I. ADMINISTRATIVE PROCEEDINGS

On April 21, 2015, Ricci ("Petitioner") protectively applied for Title II disability and disability insurance benefits. (AR 15.) Petitioner alleged disability beginning over twelve years earlier, on October 16, 2002. (*Id.*) Her claim was denied initially on July 7, 2015 and then again on reconsideration on March 4, 2016. (*Id.*) Thereafter, she requested a hearing and she appeared and testified at a hearing in Boise, Idaho on January 10, 2018. (*Id.*) Administrative Law Judge ("ALJ") Christopher R. Inama then issued a written decision on May 1, 2018 in which he denied

---

[1] Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted in as the Respondent in this suit. No further action need be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

**MEMORANDUM DECISION AND ORDER – 1**

Petitioner's claim based upon his finding that Petitioner was not disabled within the meaning of the Social Security Act during the period from her alleged onset date through her date last insured of December 31, 2007.  (AR 15–24.)

Petitioner timely requested review from the Appeals Council on May 17, 2018.  (AR 193.)  On February 12, 2019, the Appeal Council denied Petitioner's Request for Review, making the ALJ decision the final decision of the Commissioner of Social Security.  (AR 1.)

Administrative remedies exhausted, Petitioner filed this case and contends that "[t]he decision denying Petitioner's claim is not in accordance with the purpose and intent of the Social Security Act, nor is it in accordance with the law, nor is it in accordance with the evidence, but contrary thereto and to the facts and against the evidence, in that Petitioner is disabled from performing substantial gainful activity."  Pet. for Review 2 (Dkt. 1).  Petitioner argues error in the ALJ's (1) treatment of medical opinion evidence; (2) rejection of Petitioner's credibility; (3) rejection of lay witness testimony; and (4) assignment of a residual functional capacity that Petitioner says is not based on substantial evidence.  *See generally* Pet'r's Mem. (Dkt. 13). Petitioner asks for reversal and remand for an immediate award of benefits.  *Id.* at 20.

## II. <u>STANDARD OF REVIEW</u>

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards.  42 U.S.C. § 405(g); *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017).  Findings as to any question of fact, if supported by substantial evidence, are conclusive.  42 U.S.C. § 405(g).  In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence.  *See Treichler v. Comm'r of Social Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a

**MEMORANDUM DECISION AND ORDER – 2**

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The standard requires more than a scintilla but less than a preponderance (*Trevizo*, 871 F.3d at 674), and it "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the Court is to review the record as a whole to decide whether it contains evidence that would allow a person of a reasonable mind to accept the conclusions of the ALJ. *Richardson*, 402 U.S. at 401; *see also Ludwig*, 681 F.3d at 1051. The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Treichler*, 775 F.3d at 1098. Where the evidence is susceptible to more than one rational interpretation, the reviewing court must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record. *Ludwig*, 681 F.3d at 1051. In such cases, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *Batson v. Comm'r of Social Sec.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

The decision must be based on proper legal standards and will be reversed for legal error. *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir. 2015); *Treichler*, 775 F.3d at 1098. Considerable weight is given to the ALJ's construction of the Social Security Act. *See Vernoff v. Astrue*, 568 F.3d 1102, 1105 (9th Cir. 2009). However, this Court "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

### III. <u>DISCUSSION</u>

#### A.     Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (20 C.F.R. §§

404.1520, 416.920) – or continues to be disabled (20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). SGA is work activity that is both substantial and gainful. 20 C.F.R. §§ 404.1572, 416.972. "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b), 416.972(b). If engaged in SGA, disability benefits are denied regardless of the claimant's medical condition, age, education, and work experience. 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Petitioner did not engage in substantial gainful activity during the period from her alleged onset date of October 16, 2002 through her date last insured of December 31, 2007. (AR 17.)

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" if it does not significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522, 416.922. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied. 20 C.F.R.

MEMORANDUM DECISION AND ORDER – 4

§§ 404.1520(c), 416.920(c).  Here, the ALJ found that, as of her date last insured, Petitioner had

the following severe impairment: "degenerative disc disease."  (AR 17.)

In the third step, the ALJ must determine the medical severity of any impairments; that is,

whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404,

Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the answer is

yes, the claimant is considered disabled under the Social Security Act and benefits are awarded.

20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairments neither meet nor equal a listed

impairment, her claim cannot be resolved at step three and the evaluation proceeds to step four.

20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the ALJ found that Petitioner did not have an

impairment or combination of impairments that met or medically equaled the severity of one of

the listed impairments.  (AR 19.)

In the fourth step of the evaluation process, the ALJ decides whether the claimant's

residual functional capacity ("RFC") is sufficient for the claimant to perform past relevant work.

20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's RFC is her ability to do

physical and mental work activities on a sustained basis despite limitations from her

impairments.  20 C.F.R. §§ 404.1545, 416.945.  An individual's past relevant work is work she

performed within the last 15 years or 15 years prior to the date that disability must be

established, if the work was substantial gainful activity and lasted long enough for the claimant

to learn to do the job.  20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  Here, the ALJ

found that Petitioner had the RFC to perform:

> light work, as defined in 20 CFR 404.1567(b), except she can occasionally climb
> ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb
> ladders, ropes, or scaffolds. With the bilateral upper extremities, she is limited to
> occasional overhead reaching and frequent lateral reaching, handling, and
> fingering. She should avoid concentrated exposure to extreme cold, to vibration,

**MEMORANDUM DECISION AND ORDER – 5**

and to hazards such as unprotected heights and dangerous machinery. Limit noise exposure to normal office level.

(AR 19.)  Based on this RFC, the ALJ further found that Petitioner was able to perform her past relevant work as a child monitor/nanny.  (AR 22–23.)

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of her impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Garrison v. Colvin,* 759 F.3d 995, 1011 (9th Cir. 2014).  If the claimant can do such other work, she is not disabled; if the claimant cannot do other work and meets the duration requirement, she is disabled.

The ALJ's step four finding meant that step five was not necessary.  Nonetheless, he did make step-five findings in the alternative.  First, the ALJ found that "using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled.'"  (AR 23.)  Second, he found, based in part on the testimony of a vocational expert, that Petitioner's RFC is compatible with work as an "office helper," "laundry folder," and "bench assembler" and that such jobs exist in significant numbers in the national economy.  (AR 24.)

Having concluded that Petitioner could perform past relevant work and/or jobs that exist in significant numbers in the national economy, the ALJ ruled that Petitioner "was not under a disability, as defined in the Social Security Act, at any time from October 16, 2002, the alleged onset date, through December 31, 2007, the date last insured."  (AR 24.)

## B.  Analysis

Petitioner raises four main challenges to the decision.  First, the ALJ erred in his treatment of medical opinion evidence.  Second, the ALJ erred in improperly rejecting her

credibility.  Third, the ALJ erred in improperly rejecting lay witness testimony.  Fourth, the ALJ

erred in assigning a residual functional capacity that is not based on substantial evidence.  *See*

*generally* Pet'r's Mem. (Dkt. 13).  Each argument will be addressed in turn.

**1. The ALJ did not err in his treatment of medical opinion evidence.**

Petitioner contends the ALJ erred with respect to the opinion evidence by improperly

discounting Dr. Maxwell's opinion, by improperly ignoring Dr. Shappard's opinion, and by

improperly discounting Dr. King's opinion.  *Id.* at 8–13.

The standards for weighing medical opinions are set forth in federal regulations and case

law.  Per 20 C.F.R. § 404.1527(c), every medical opinion in the record must be evaluated.  More

weight is generally given to medical opinions from treating sources than non-treating sources.

20 C.F.R. § 404.1527(c)(2).  In addition, more weight is generally given to medical opinions that

are consistent with the record as a whole and that are supported by relevant evidence such as

medical signs and laboratory findings.  20 C.F.R. § 404.1527(c)(3), (4).  A medical source's

"opinion" on an issue reserved to the Commissioner, such as whether a claimant is disabled or

cannot work, is not a medical opinion and is entitled to no special significance.  20 C.F.R.

§ 404.1527(d).

Where a treating doctor's opinion is not contradicted by another doctor, an ALJ must

provide "clear and convincing" reasons to reject the opinion.  *Baxter v. Sullivan*, 923 F.2d 1391,

1396 (9th Cir. 1991).  Where a treating doctor's opinion is contradicted by another doctor, an

ALJ must provide "specific and legitimate" reasons based on substantial evidence for rejecting it.

*Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).

### a. Dr. Maxwell's opinion.

Petitioner first takes issue with the ALJ's treatment of Dr. Maxwell's opinion.  Dr. Shane

Maxwell, D.O., provided an opinion letter dated February 15, 2018 – more than ten years after

Petitioner's date last insured.  He said:

> I have been treating patient Christina Ricci since 2007 for chronic, severe,
> debilitating migraine headaches. She has been under my continuous care since that
> time. Despite extensive medical evaluation and aggressive treatment regimen, we
> have been unable to control her headaches that cause significant impact on even her
> basic ADLs.

(AR 1342.)

The ALJ assigned "minimal weight" to Dr. Maxwell's statement, explaining that the

statement was not consistent with the record and that Dr. Maxwell's treatment of Petitioner

occurred after her date last insured:

> there are no treatment records from Dr. Maxwell regarding headaches for the period
> from the claimant's alleged onset date through her date last insured of December
> 31, 2007 (3F). There are no objective findings to support that the claimant had
> migraine headaches. Based on the medical evidence of record, she had very little
> treatment for complaints of headaches. It is unclear whether or to what extent he
> treated the claimant prior to her date last insured.

(AR 21.)  Notably, the ALJ's finding that Petitioner did not timely complain of debilitating

headaches is a common theme throughout much of his decision.

Petitioner appropriately points out that medical evaluations and treatment after the

expiration of a claimant's insured status can still be relevant to an evaluation of a pre-expiration

condition.  However, the ALJ's decision in rejecting Dr. Maxwell's opinion was not based solely

on his having treated her after her date last insured.  Rather, the ALJ also discounted Dr.

Maxwell's opinion because it is not well-supported by either objective findings or by the record.

Petitioner does not cite to contemporaneous treatment records by Dr. Maxwell, but she

notes that various other treating providers referenced Dr. Maxwell's treatments.  She says such

**MEMORANDUM DECISION AND ORDER – 8**

references show an escalating treatment plan for neck and shoulder pain, including a cervical epidural procedure in early 2008, treatment for migraine symptoms in April 2009, and additional care provided in December 2011.  Pet'r's Br. 10 (Dkt. 13) (citing AR 298, 347, 412). Accordingly, Petitioner contends Dr. Maxwell's statement was consistent with the record during the relevant time period.  She recounts portions of her medical history she deems relevant, including a November 2002 cervical spine MRI, a follow-up MRI in February 2004, and a C5-6 anterior cervical discectomy and fusion in January 2005.  Pet'r's Br. 11 (Dkt. 13) (citing AR 937, 935, 921).  But she does not assert that these records establish or support debilitating migraines, and the Court will not assume such.

Petitioner also details that she went to the emergency room in March and December of 2005, each time complaining of headache with vomiting (AR 909, 904).  She describes the diagnosis and treatment of tension headaches in August 2007 (AR 306) and a doctor's treatment notes recording her complaint of headaches in September 2007, in addition to neck pain and upper extremity pain (AR 304).  With that context of her medical history, Petitioner argues that the ALJ focused too much on whether she had been diagnosed with migraines and not enough on on the fact that she was "treated aggressively with powerful narcotics, epidural injections, and even surgery to combat the pain in her head, neck, and upper extremity."  Pet'r's Br. 12 (Dkt. 13).

Finally, in response to Respondent's highlighting the lack of objective evidence, Petitioner argues that objective evidence rarely exists in the diagnosis of migraine headaches. She references a 2009 CT scan that revealed "generalized cerebral atrophy accelerated for patient's young age" and a 2016 MRI that revealed "hyperintensities" consistent with migraines. Pet'r's Reply 2 (Dkt. 17) (citing AR 877, 819).  She argues that these imaging studies, taken

years apart, "did not reveal an unspoiled brain structure, but rather provided objective studies to support Petitioner's subjective symptoms."  Pet'r's Reply 2 (Dkt. 17).

The CT imaging scan report includes a "Conclusion" section which says, in bold print, "No acute intracranial process."  (AR 877.)  Moreover, the "Indications" listed are "Dizziness. Nausea. Evaluate for abnormalities."  (*Id.*)  Conspicuously absent from the 2009 scan report is any reference to headaches.  Petitioner does not identify any medical source interpreting this scan as consistent with migraines.  The "Indications" section of the report for the 2016 MRI does list "Migraine headache with left sided neck pain and left upper extremity numbness," and the "Conclusion" section says the findings "can be seen in setting of chronic migraines."

The Court is satisfied that the 2016 MRI, at least, constitutes an objective finding that is consistent with Dr. Maxwell's opinion statement.  However, Petitioner has not shown that the 2009 CT likewise constitutes a consistent objective finding.  Moreover, Petitioner has not attempted to establish, other than through Dr. Maxwell's opinion, that these scans support functional limitations consistent with a finding of disability as of her date last insured of December 31, 2007.

More fundamentally, there is nothing that undermines the ALJ's finding that through the date Petitioner was last insured, "she had very little treatment for complaints of headaches."  (AR 21.)  As noted above, Petitioner does point to timely ER visits related to headaches, but she offers no counter to the ALJ's record-supported findings elsewhere in the decision that:

> [i]n November 2004, she reported, her headaches were pretty much resolved, and she denied any nausea [AR 426]. She continued to deny headaches, including photophobia, until March 2005, when she was seen a few weeks after her cervical fusion in the emergency room, with nausea and vomiting, which was forceful, but she reported only a mild headache [AR 909, 919]. Nine months later, in December 2005, she was treated in the emergency room for vomiting and a headache, but denied having headaches and had no further treatment for complaints of headaches

**MEMORANDUM DECISION AND ORDER – 10**

again, until almost two years later, in September 2007, after she had gone on a ten
hour road trip [AR 304].

(AR 21.)

Thus, as the ALJ found, Petitioner's headaches were "resolved" or "mild" at various
instances prior to her date last insured, and the only cited record of her seeking treatment for
headache in the two years prior to such date was in September 2007, after a ten-hour road trip.

In this setting, reasonable minds could conclude differently as to the evidence, and as to
both the timing and the severity of Petitioner's migraines. The ALJ possibly could have
concluded that the evidence established Petitioner's headaches were sufficiently debilitating, as
of her date last insured, to mean that she was disabled. But he did not do so. Rather, the ALJ
interpreted the evidence as failing to support a finding that Petitioner was disabled by headaches
as of her date last insured. That conclusion of the ALJ must be upheld if it is supported by
substantial evidence. This record, as to the ALJ's finding that Petitioner "had very little
treatment for complaints of headaches" (AR 21) prior to her date last insured, is sufficiently
supported. It is, therefore, a "clear and convincing reason" for discounting Dr. Maxwell's
opinion. Although Petitioner argues the converse in a sensible alternative view, it is not
sufficient to establish error.

      **b.  Dr. Shappard's opinion.**

Next, Petitioner contends the ALJ erred by failing to consider Dr. Shappard's opinion at
all. Dr. Scott Shappard, D.O., provided an opinion letter dated September 6, 2017 – almost ten
years after Petitioner's date last insured – in which he said:

> Christina is a patient under my care. I have cared for her since
> approximately early 2003. She has been medically unable to work over the entire
> course of my interaction with her (since 2003). This is a medical disability. Thank
> you for your time and consideration.

**MEMORANDUM DECISION AND ORDER – 11**

(AR 684.)

This letter is not mentioned – at all – in the ALJ decision.  Petitioner argues that it was reversible error for the ALJ to not address Dr. Shappard's letter and its statements regarding Petitioner's medical condition.  Pet'r's Br. 12 (Dkt. 13).

No harm resulted from the ALJ's failure to discuss this statement, according to Respondent, because statements that a claimant is disabled or unable to work "are not medical opinions … but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case."  Resp't's Br. 9 (Dkt. 14) (quoting 20 C.F.R. § 404.1527(d)).  It is correct that no special significance is given to such statements (20 C.F.R. § 404.1527(d)(3)) because "disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity."  *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011).  Medical sources are not qualified to opine as to disability because they "ordinarily do[] not consult a vocational expert or have the expertise of one."  *Id.*  Nor do they possess the authority to make administrative findings that are binding on Respondent.

Petitioner disagrees.  She says Dr. Shappard expressed an opinion consistent with the medical record, even though she admits Dr. Shappard "may not have provided direct care for Petitioner's headaches."  Pet'r's Reply 5 (Dkt. 17).  She also cites *Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012), for the proposition that a treating physician's statement a claimant would "unlikely be able to work" was not a conclusion reserved to the Commissioner but rather an opinion based on objective medical evidence of the likelihood of a claimant's ability to sustain full-time employment.

**MEMORANDUM DECISION AND ORDER – 12**

This case is not like *Hill*.  In *Hill*, the ALJ did not speak to an opinion that the claimant's "combination of mental and medical problems makes the likelihood of sustained full time competitive employment unlikely."  *Id.*  The *Hill* court ruled that the use of the word "unlikely" distinguished the physician's "assessment, based on objective medical evidence" from "a conclusory statement like those described in 20 C.F.R. § 404.1527(d)(1)."  *Id.*  That is, the statement in *Hill* expressed the physician's opinion of the *likelihood* that the claimant could work, without asserting outright that she could not.  In contrast, Dr. Shappard's statement is inescapably framed in conclusory, absolute terms: "[s]he *has been* medically unable to work . . . . [t]his *is* a medical disability."  (AR 684 (emphases added).)  There is no adjectival or other language in Dr. Shappard's statement that might tether it to a medical opinion rather than a declaration of the nature of "administrative findings that are dispositive of a case."  20 C.F.R. § 404.1527(d).

While it would have been better if the ALJ had discussed Dr. Shappard's statement, it consists of five sentences, the first two of which state background facts and the last of which is merely a formal pleasantry.  Otherwise, he says Petitioner "has been medically unable to work … since 2003" and that "[t]his is a medical disability."  Neither assertion is a diagnosis, medical finding, assessment of functional limitation, or the like.  Both assertions relate only to matters reserved to the Commissioner of Social Security.  As such, per 20 C.F.R. 404.1527(d), they are not "medical opinions" and they are not entitled to "any special significance."  There is no error.

### c.   Dr. King's opinion.

Petitioner also takes issue with the ALJ's treatment of Dr. King's opinion.  Dr. Neil King, D.C., is a chiropractor who treated Petitioner from at least October 2002 through April 2005.[2] Dr. King provided an opinion letter dated November 19, 2004 documenting his assessment and treatments of Petitioner over time.  (AR 288–289.)  This letter is substantially more detailed than the statements provided by Dr. Maxwell and Dr. Shappard.  Dr. King described that Petitioner's symptoms included headaches and he said that "treatments, exams, medications and lifestyle changes have been unsuccessful in alleviating her pain and dysfunction."  (AR 289.)  He also opined that Petitioner "has had periods of exacerbation and remission of symptoms, but the overall trend has been only mild improvements" and that Petitioner "will never return to the pre-accident state of health she was enjoying."  (*Id.*)

The ALJ assigned Dr. King's statement "minimal weight," because he is not an "acceptable medical source" under applicable Social Security regulations and because "the evidence of record reveals she had very little treatment for headache complaints for the period at issue."  (AR 22.)  The ALJ also said that Dr. King's letter does not expressly support Petitioner's testimony that she was in bed every day from 2002 through her surgery in 2005 due to headaches.  (*Id.*)

Petitioner acknowledges that a chiropractor is not an acceptable medical source.  But, Petitioner also points out that the ALJ was required to provide "germane reasons" to discount his opinion.  *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).  Petitioner contends the ALJ failed to provide germane reasons to discount Dr. King's letter.  To further support her argument

---

[2] The record is not clear when Petitioner stopped seeing Dr. King.  The records cited by Petitioner show visits to Dr. King between October 25, 2002 and April 20, 2005.  (AR 1045–1099.)

**MEMORANDUM DECISION AND ORDER – 14**

in that regard, Petitioner points to extensive billing statements in the record that she contends support Dr. King's statements that frequent ongoing care was required, and she says the ALJ erred by focusing on pain specifically related to headaches while ignoring evidence of aggressive treatment for pain in her neck, shoulder, and arm.

However, Petitioner's criticism of the ALJ's treatment of Dr. King's opinion, as with Dr. Maxwell's opinion, is at its core an argument for a different interpretation of the evidentiary record, without showing that the AJL's conclusion about Dr. King's opinion lacked substantial evidence or was otherwise legally inadequate.  The ALJ noted that in the same month Dr. King wrote his opinion – November 2004 – Petitioner herself reported her headaches had resolved.[3] Further, the ALJ described that Petitioner continued regular treatment with Dr. King after that date, demonstrating that "the visits … were not exclusively for headache complaints."  (AR 22.) The inconsistency emphasized by the ALJ between Dr. King's opinion of the severity of Petitioner's headaches and (a) Petitioner's own reports and (b) continuing to seek chiropractic treatment after reporting that her headaches had resolved, constitute germane reasons for the ALJ's decision to give minimal weight to Dr. King's opinion.  There is no error in doing so.

### 2.  There was no error in the ALJ's treatment of Petitioner's statements.

Petitioner next contends the ALJ improperly discounted her statements without providing "clear and convincing reasons" for doing so.  Pet'r's Br. 13–17 (Dkt. 13).  She describes a two-step process by which a claimant's testimony regarding subjective symptoms is analyzed, which first calls for the ALJ to decide whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other

---

[3] The ALJ says that Dr. King's opinion was dated November 2014 (AR 22), but the letter in the record is clearly dated November 19, 2004 (AR 288).  That distinction is of no consequence here.

**MEMORANDUM DECISION AND ORDER – 15**

symptoms alleged.  *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–1036 (9th Cir. 2007)).  The ALJ here found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (AR 20.)

Petitioner contends that "[i]f the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so."  Pet'r's Br. 14 (Dkt. 13) (citing *Trevizo v. Berryhill*, 862 F.3d 987 (9th Cir. 2017) (opinion amended and superseded on denial of rehearing by *Trevizo v. Berryhill*, 871 F.3d 664 (9th Cir. 2017)).

Against that standard, the Court can discern from the decision that the ALJ recounted Petitioner's relevant medical history, starting with her motor vehicle accident in October 2002 and discussing her symptoms, limitations, diagnoses, and treatments from that point forward. (AR 20–21.)  In particular, the ALJ noted that Petitioner took three separate vacations, that she was able to garden and do other activities around her home, and that her activities of daily living had improved.  (AR 20.)  As to Petitioner's headaches, the ALJ found that:

> [w]hile the evidence does demonstrate that the claimant has had persistent neck, arm, and back pain since the accident, her purported level of functional compromise, particularly related to headaches, is not supported by the medical evidence. Throughout the record for the period at issue, she received very little treatment for complaints of headaches. In January 2004, she reported that, about twice a month, her neck pain led to headaches and caused some nausea [AR 432]. Six months later, she reported, her headaches had increased in frequency. Her doctor felt they were rebound headaches, as a result of the amount of medications she was taking [AR 430]. In November 2004, she reported, her headaches were pretty much resolved, and she denied any nausea [AR 426]. She continued to deny headaches, including photophobia, until March 2005, when she was seen a few weeks after her cervical fusion in the emergency room, with nausea and vomiting, which was forceful, but she reported only a mild headache [AR 909, 919]. Nine months later, in December 2005, she was treated in the emergency room for

**MEMORANDUM DECISION AND ORDER – 16**

vomiting and a headache, but denied having headaches and had no further treatment
for complaints of headaches again, until almost two years later, in September 2007,
after she had gone on a ten hour road trip [AR 901; AR 304].

(AR 21.)  Although not separately described in the text of his decision, the ALJ did cite to a

medical record from February 2007 in which a Dr. Rasmus, M.D., noted that Petitioner "does not

have headaches."  (AR 901.)  Synthesizing these particulars of the evidence of record, the ALJ

concluded:

the medical evidence is inconsistent with the claimant's testimony that she was in
bed every day with a migraine from the accident in 2002 through the surgery in
2005. She only complained of headaches twice during that period, and there is no
evidence of any emergency room visits related to headaches during that time. After
the surgery, up until the date last insured, she was treated only three times for
complaints of headaches, once for a mild headache only a few weeks following the
surgery, nine months later, and then almost two years after that.

(AR 21.)

Petitioner challenges the ALJ's conclusion, arguing that the ALJ said nothing about how

the cited records were supposedly inconsistent with Petitioner's allegations of severe pain and

her inability to care for herself.  Petitioner references a "function report" she completed in 2015,

which describes, among other things, a "triple disc neck fusion" surgery she underwent in May

2015.  Pet'r's Br. 15 (Dkt. 13) (citing AR 233–240).  Petitioner also criticizes the ALJ's reliance

on her activities of daily living and vacations, which she describes as "meager."  *Id.*  Petitioner

then draws upon the same records cited by the ALJ, but highlights instead references that

evidence she was "having trouble sleeping," that "she is doing poor to not at all" with respect to

"work responsibilities, home, family, children, hobbies, and sleeping," and that "she reports she

is still waking up with a lot of pain."  *Id.* at 15–16.  The ALJ "did not explain how notes of mild

improvement in the face of escalating treatment detracted from Petitioner's testimony," she says.

*Id.* at 16.  Finally, Petitioner draws upon court decisions holding that there are critical differences

**MEMORANDUM DECISION AND ORDER – 17**

between activities of daily living and activities in a full-time job.  *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014)).

Respondent frames the ALJ's decision as providing two primary reasons for discounting Petitioner's credibility: first, the inconsistency between her testimony and the treatment record; and, second, the evidence of her daily activities. Respondent points out that Petitioner testified before the ALJ that although her surgery provided relief and was "very helpful" in addressing her neck problems, the "disabling issue" was her migraine headaches.  (AR 37–38, 42, 44). Further, Respondent contends that Petitioner's counsel admitted at the hearing that Petitioner's headaches were not very well documented.  (AR 40.)

It is correct that the ALJ found the medical evidence to be "inconsistent with the claimant's testimony that she was in bed every day with a migraine from the accident in 2002 through the surgery in 2005."  (AR 21.)  Further, the ALJ highlighted the scant evidence regarding Petitioner's complaints or treatment of headaches in the relevant timeframe. The Court has considered Petitioner's challenges to the ALJ's assessment of Petitioner's credibility, but on review of the record against the ALJ's decision on this subject, the Court concludes that the ALJ provided a clear and convincing reason for discounting Petitioner's testimony, and Petitioner has not shown legal error in such reasoning.

Petitioner separately argues that the ALJ's reliance on her "meager" activities as showing she was less limited than she claimed is not a clear and convincing reason for discounting her credibility.  The Court does not reach this issue because its resolution does not change the outcome of this case.  Because the ALJ provided a clear and convincing reason for discounting Petitioner's credibility based on inconsistency between her testimony and the medical evidence

**MEMORANDUM DECISION AND ORDER – 18**

of record, even if the ALJ's alternative rationale was separately inadequate, the overall evaluation of Petitioner's credibility remains legally adequate.

Finally, Petitioner takes issue with the ALJ's dismissal of a "clarifying letter" from Dr. Little.  The ALJ gave it negligible weight because it provided no detail regarding the severity of Petitioner's migraines.  Pet'r's Br. 16 (Dkt. 13).  She contends that "Dr. Little's lack of treatment for migraines in no way detracts from Petitioner's credibility or consistency with the record," given that Dr. Little was not seeing Petitioner for migraine headaches.

The ALJ said the statements in Dr. Little's opinion "provide little probative value with regard to this claimant's specific allegations of migraine headaches and their frequency."  (AR 21.)  The statements had no significance to the ALJ on the relevant issue not because of what they did contain, but rather because of what they did not contain.  The challenge Petitioner faces and cannot overcome is the dearth of contemporaneous evidence – medical records or otherwise – that show the limiting effects of her headaches prior to the date last insured.  Hence, on this subject, Petitioner has not shown the ALJ erred with respect to Dr. Little's opinion or that, overall, the ALJ's assessment of her credibility is unsupported by substantial evidence.

### 3. There is no error in the ALJ's treatment of lay witness statements.

Petitioner finds error in the ALJ's decision to discount the lay witness testimony of her husband, Donald Ricci.  In his letter dated January 4, 2018, Mr. Ricci said, *inter alia*, that he "was fired for excessive absences because of the requirements of being Christina's caregiver. Her frequent and debilitating migraines often caused me to have to remain at home to care for her or take her to a chiropractor or, sometimes, the emergency room.  We've struggled constantly since then, since I have limited employment opportunities consistent with being Christina's caregiver."  (AR 290.)

**MEMORANDUM DECISION AND ORDER – 19**

An ALJ may dismiss the testimony of a lay witness only by giving reasons germane to the witness. *Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  As to Mr. Ricci's letter, the ALJ said:

> The claimant's spouse, Donald A Ricci, reported that he had been fired for frequent absences related to him taking care of the claimant. He indicated that her frequent and debilitating migraines often caused him to have to remain at home to care for her or take her to a chiropractor or sometimes the emergency room [AR 290]. Negligible weight is assigned to Mr. Ricci's statement as the evidence of record for the period at issue. It is inconsistent with the lack of medical treatment, as discussed. As noted previously, she received treatment, complaining of headaches, only five times in the five years from her alleged onset date of October 16, 2002 through the date last insured in December 2007. Additionally, whether the claimant's husband's employment opportunities are limited is not material to this decision.

(AR 22.)

Petitioner contends the ALJ "focused largely on Petitioner's allegations of headaches and migraines and lost track of the over-arching picture – that Petitioner suffered debilitating pain from a neck injury as well as the headaches."  Pet'r's Br. 17 (Dkt. 13).  She frames the statement as documenting "the assistance and time required to care for Petitioner's pain."  *Id.*  She also notes numerous instances where medical records reflect that Mr. Ricci accompanied Petitioner to the visit.  *Id.*  Petitioner implies that the ALJ discounted Mr. Ricci's testimony without providing a germane reason.

Mr. Ricci's statement does not refer to a neck injury or other pain; it refers expressly and exclusively to "frequent and debilitating migraines."  (AR 290.)  Thus, Petitioner's argument that Mr. Ricci's statement generally refers to her pain (which the undisputed record shows, that for "other pain," she did frequently seek care to address) goes too far here, where, as Petitioner admits, the precise issue is whether Petitioner's *headaches* were disabling as of her date last insured.  As discussed throughout this decision, the ALJ's finding that the record reflects little

**MEMORANDUM DECISION AND ORDER – 20**

evidence of timely headache complaints or treatments is supported by substantial evidence.  The ALJ's discounting of Mr. Ricci's statement because it is inconsistent with the record is therefore a germane reason.  Petitioner has shown no error with respect to the ALJ's weighing of Mr. Ricci's statement.

On this issue, Petitioner disagrees with the ALJ's interpretation of the evidence and urges an alternative interpretation.  But the ALJ's interpretation is supported by substantial evidence, and an alternative interpretation, even if arguably plausible, cannot prevail against that measure.

**4.  Petitioner has not shown error in the ALJ's RFC assessment.**

Petitioner contends the ALJ's RFC was not based on substantial evidence because of errors in weighing medical source statements, her credibility, and lay witness statements, as addressed *supra*.  The Court is not persuaded the ALJ erred with respect to any such evidence; hence, the ALJ's RFC assessment withstands this line of attack.

However, Petitioner offers an alternative argument that the RFC is legally inadequate. She argues that the ALJ failed to include all of her functional limitations in the RFC, and the ALJ "is not free to disregard properly supported limitations" when evaluating a claimant's RFC. Pet'r's Br. 18 (Dkt. 13) (quoting *Robbins v. Social Sec. Admin.*, 466 F.3d 886 (9th Cir. 2006)). The ALJ must consider all relevant evidence in the record in deciding the RFC, including "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883.  According to Petitioner, the ALJ found that the Petitioner suffered from degenerative disc disease, a condition known to cause pain, but the ALJ's RFC did not include limitations relevant to dealing with pain.  Such limitations, Petitioner contends, would include such things as time off task to take medications and the need to attend frequent medical appointments.  During the relevant time period, she attended chiropractic

**MEMORANDUM DECISION AND ORDER – 21**

appointments three times per week, pain management appointments monthly, and other consultant appointments and emergency room visits as needed.  She argues that the ALJ failed to account for the time away from work or off-task while at work when he posed hypothetical questions to the testifying vocational expert.  Yet, the vocational expert testified that employers generally tolerate time off task up to ten percent and one to two absences per month.  (AR 61.) She implies that had the ALJ properly included attendance restrictions in the RFC due to necessary medical appointments and taking medication, she would have been found disabled.

Respondent argues that the ALJ did not need to account for time off-task to take medication or to attend medical appointments, because an RFC "is an assessment of a claimant's ability to do sustained work-related activities in a work setting on a regular and continuing basis."  Resp't's Br. 16 (Dkt. 14) (citing SSR 96-8p, 1196 WL 374184).  Instead, the RFC is "a determination regarding the most a claimant can do despite her limitations."  *Id.* (citing 20 C.F.R. § 404.1545).  Thus, Respondent argues, the RFC "does not contemplate activities that occur outside of the work setting."

There is a missing piece to Respondent's argument, as the text of SSR 96-8p also defines that "a 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  This template in the regulation immediately follows the sentence relied upon by Respondent.  Thus, Petitioner's absenteeism necessitated by medical and chiropractic appointments, or her time off-task for taking medications and waiting for their effects to begin, might interfere with her ability to work on a "regular and continuing basis" if such activities preclude her from working "8 hours a day, for 5 days a week, or an equivalent work schedule."

Petitioner's argument further relies on the vocational expert's testimony that employers generally tolerate time off task up to ten percent and one to two absences per month.  Pet'r's Br.

**MEMORANDUM DECISION AND ORDER – 22**

19 (Dkt. 13) (citing AR 61).  However, this characterization omits key context from the expert's testimony.  The vocational expert described Petitioner's prior work as a nanny as "semi-skilled, with an SVP of 3.  It's classified as medium.  Claimant performed it at a light level."  (AR 58.) From there, the ALJ posed two hypothetical scenarios to the expert, one based on a light exertion level and the other based on a sedentary level, each with additional postural or environmental limitations.  (AR 58–61.)  The RFC the ALJ ultimately assigned for Petitioner matched the first hypothetical he presented to the vocational expert, based on a light exertion level.  As to that hypothetical, the expert testified that an individual with the described limitations could do the work of a nanny at the light level, as Petitioner had previously performed it.  (AR 58–59.)  There would be other "light" jobs in the economy, the expert went on to say, that an individual with the noted limitations could perform, including "office helper," "bench assembler," and "laundry folder."  (AR 59, 60.)  Each such job, the expert said, was "unskilled."  (AR 59, 60.)  With respect to the second hypothetical, keeping the same postural and environmental limitations but at the sedentary rather than light exertion level, the expert testified that jobs such as "addressing clerk," "charge-account clerk," and "food and beverage order clerk," would all satisfy the hypothetical.  (AR 60–61.)  Again, the expert said such jobs were "unskilled."  (AR 60, 61.) Thus, each of the jobs the expert discussed was "unskilled" with the exception of Petitioner's prior work as a nanny, which the expert described as "semi-skilled."

After posing the hypothetical scenarios, the following exchange involving the ALJ, the vocational expert, and Petitioner's counsel occurred:

ALJ:   Thanks. Do you have an opinion how much time off task, excess of regularly scheduled breaks, would employers in these *unskilled* jobs tolerate?

VE:   Up to ten percent. Anything more than that would preclude this *unskilled* work.

ALJ:   Thanks. And absences per month?

VE:    One to two days, maximum. Anything more than that would preclude *this* work.

ALJ:   Thanks. And those are not in DOT,[4] are they?

VE:    No. Off task and absenteeism is not addressed in the DOT, nor its companion publications. That response is based upon over 30 years' experience as a vocational rehabilitation counselor, analyzing jobs and working with employers.

ALJ:   Thanks. Mr. Bernhardt?

ATTY: I don't have any follow-up questions, Your Honor. I knew, from the beginning, that we would ultimately be looking at Step 5. And that question of could we do light; could we do sedentary for a younger individual; jobs are available; or are the headaches truly happening frequently enough that we would have time off task or we would have absenteeism; and that's what it boils down to.

ALJ:   Okay. Thanks.

(AR 61–62 (emphases added).)

Thus, the vocational expert's testimony regarding the limits of time off-task and absenteeism was confined to the context of the unskilled jobs he listed as compatible with the hypotheticals posed by the ALJ. Such testimony did not apply to the semi-skilled job as a nanny that Petitioner had previously engaged in. The vocational expert simply did not testify about time off-task or absenteeism in the context of semi-skilled work as a nanny.

There were no follow-up questions asked of the expert about whether the same attendance parameters applied to work as a nanny. Perhaps, if asked, the expert would have said yes. Perhaps, if asked, the expert would have given a different answer. Perhaps a nanny job might have more schedule flexibility than the unskilled jobs discussed, but perhaps a nanny job might also have periods of schedule inflexiblity. Regardless, the record simply cannot be reconciled with Petitioner's contention that the vocational expert's testimony could not support a finding that Petitioner was capable of performing past relevant work as a nanny.

---

[4] DOT is the Dictionary of Occupational Titles. *See* AR 57.

**MEMORANDUM DECISION AND ORDER – 24**

Petitioner contends the ALJ's step five finding that she could perform other work was not supported by substantial evidence. Although she frames the argument as broadly applying to the ALJ's RFC assessment, the applicable scope of her argument properly only reaches the step five finding. In this case, the ALJ's step five finding was made in the alternative. After the ALJ found at step four that Petitioner could perform past relevant work, the ALJ did not need to make a step five finding. Thus, any challenge to the ALJ's step five finding is immaterial unless Petitioner shows legal error in the RFC or in the step four finding. Petitioner has not done so here. Accordingly, the Court need not and does not decide whether the ALJ's step five finding was erroneous.

If Petitioner's argument is considered as a more general challenge to the ALJ's RFC assessment, it lacks evidentiary support in the record. Petitioner goes to some length to summarize her various appointments in the years prior to her date last insured of December 31, 2007:

> Petitioner presented to Dr. Hlavinka seven times between November 15, 2002, and November 22, 2004. (Tr. 426-437). In June 2004, Petitioner saw Dr. James Moreland on two occasions for epidural injections. (Tr. 792-794). From January 13, 2005 to June 3, 2005, Petitioner was treated with a cervical fusion by Dr. Kenneth Little and seen five times in the emergency department for headaches and neck pain. (Tr. 904-929). Billing records from King Family Chiropractic dated October 25, 2002, through June 28, 2004, indicate Petitioner underwent chiropractic treatment two to three times per week. (Tr. 1045-96). Between December 2, 2004, and December 9, 2007, Petitioner saw Dr. Mallari sixteen times for pain control, and ten of those visits were in 2007. (Tr. 301-319).

Pet'r's Reply 8–9 (Dkt. 17). Most of these visits occurred well before she claimed her headaches were resolved and before her date last insured. By Petitioner's own reckoning, in 2007 she had less than one appointment per month. Hence, even if the Court were to credit broadly the vocational expert's testimony that employers tolerate "[o]ne to two days, maximum" of absences

**MEMORANDUM DECISION AND ORDER – 25**

per month, Petitioner still has not shown that she would have exceeded that threshold as of her date last insured.

Petitioner has not shown the ALJ erred in his RFC assessment.

## IV. <u>CONCLUSION</u>

Petitioner has not shown the ALJ committed reversible legal error regarding weighing medical source statements, Petitioner's credibility, or lay witness statements.  Nor has Petitioner shown that the ALJ's RFC assessment or his finding that Petitioner could engage in past relevant work were erroneous.  Accordingly, the ALJ's decision is supported by substantial evidence and it will be upheld.  Petitioner's Petition for Review will be denied.

## V. <u>ORDER</u>

Based on the foregoing, Petitioner's Petition for Review (Dkt. 1) is **DENIED,** the decision of the Commissioner is **AFFIRMED,** and this action is **DISMISSED** in its entirety, with prejudice.



D ATED: November 30, 2020

_____
Honorable Ronald E. Bush
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER – 26**